# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JO ANN S.,                        )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        1:25CV858
                                  )
FRANK J. BISIGNANO,               )
Commissioner of Social            )
Security,                         )
                                  )
                Defendant.[1]     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jo Ann S., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) The Commissioner has filed the certified administrative record (Docket Entry 4 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 8 (Plaintiff's Brief); Docket Entry 11 (Commissioner's

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute as Defendant in this suit. Neither the Court nor the parties need take further action to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Brief); Docket Entry 12 (Plaintiff's Reply)).  For the reasons that follow, the Court should enter judgment for the Commissioner.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 220-21), alleging a disability onset date of November 4, 2021 (see Tr. 220).  Upon denial of that application initially (Tr. 89-99, 115-24) and on reconsideration (Tr. 100-09, 126-33), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 134).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 37-88.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 14-36.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 216-18, 337-69), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2026, as confirmed by her certified earnings record.

2.  [Plaintiff] has not engaged in substantial gainful activity since November 4, 2021, the alleged onset date.

. . .

3.  [Plaintiff] has the following severe impairments: degenerative joint disease of the right knee; status post arthroscopic surgery of the right knee; degenerative disc disease; obesity; and asthma.

. . .

2

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except she can stand and/or walk for up to one hour at a time, followed by at least fifteen minutes of work in a seated position; she can stand and/or walk [f]or up [to] four hours in an eight-hour day. She can sit for up to six hours in an eight-hour workday. [She] can lift and/or carry twenty pounds occasionally and ten pounds frequently. She can frequently balance and stoop. She can occasionally kneel, crouch, and crawl. [She] can never climb ladders, ropes, poles, or scaffolds. She can frequently climb ramps and stairs. She should avoid concentrated exposure to heat; humidity; wetness; workplace hazards, such as unprotected heights and moving machine parts; and pulmonary irritants such as fumes, dust, gases, and poor ventilation.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from November 4, 2021, through the date of th[e ALJ's] decision.

(Tr. 19-30 (bold font and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If

4

there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of Soc. Sec. Admin.</u>, 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." <u>Hunter</u>, 993 F.2d at 35 (internal citations omitted).

6

claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide

_____

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

7

"whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

### B.  Assignment of Error

Plaintiff's first and only assignment of error maintains that "[t]he [ALJ]'s decision failed to support its [RFC] findings and opinion evaluations with substantial evidence." (Docket Entry 8 at 3 (bold font and block formatting omitted); see also Docket Entry 12 at 1-2.)  In particular, Plaintiff argues that "the lack of depth to the [ALJ's] analysis of the[] opinions [of treating orthopedic surgeon Dr. Brian Robert Waterman, consultative medical examiner Dr. Agustin Flores, and the state agency medical consultants] shows both insufficient compliance with 20 C.F.R. § 404.1520c(b)(2) and a lack of support for excluding further standing/walking limitations [from the RFC]."  (Docket Entry 8 at

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

10 (citing Tr. 27-28).) According to Plaintiff, "[t]h[at] issue is compounded by the [ALJ]'s similarly arbitrary finding against RFC restrictions regarding leg elevation and sitting" (id. at 12), because "nothing in the record [] justif[ies] the RFC's fifteen minutes of sitting between hours of standing . . . beyond arbitrary reasoning" (id.), and the ALJ provided an "insufficient discussion" of his reasons for rejecting "Plaintiff['s] report[ of] a need to elevate the right leg when sitting" (id. at 13 (citing Tr. 26-27)). For the reasons that follow, those contentions fall short.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 220-21)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence, see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or accord special deference to treating source opinions. See 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources"). Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b) (emphasis added). Moreover, when a medical

9

source provides more than one opinion, the ALJ can evaluate the persuasiveness of such opinions "together in a single analysis," and need not articulate how he or she considered those opinions "individually."  20 C.F.R. § 404.1520c(b)(1).

In evaluating the persuasiveness of an opinion, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of an opinion.  20 C.F.R. § 404.1520c(b)(2).[6]  The ALJ must discuss the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion, 20 C.F.R. § 404.1520c(c)(3)-(5) — only when the ALJ finds two or more opinions about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 404.1520c(b)(3).

## 1.  Dr. Waterman's Opinions

On October 11, 2022, Dr. Waterman, who performed arthroscopic surgery on Plaintiff's right knee on January 10, 2022, repairing two meniscal tears (see Tr. 693-707), prepared a letter "To Whom It May Concern" in connection with Plaintiff's Workers' Compensation

---

[6] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(1).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(2).

10

claim arising out of her November 4, 2021, on-the-job injury (Tr. 1111). In that letter, Dr. Waterman noted that a recent Functional Capacity Evaluation ("FCE") showed Plaintiff's "work capacity [was] consistent with permanent Sedentary-Light Occupational restrictions, particularly given [her] persistent right knee pain." (Id.) Dr. Waterman "[r]ecommend[ed a] 10 [pound] lifting restriction and avoidance of deep knee bending, stooping, crawling, climbing, and repetitive pivoting or rotational activities." (Id.) In Dr. Waterman's estimation, Plaintiff qualified for a "10% lower extremity impairment rating based on reconstructive knee surgery." (Id.)

The ALJ summarized Dr. Waterman's above-quoted opinions (see Tr. 27), and then assessed them as follows:

> The [ALJ] finds this opinion to be partially persuasive and acknowledges the treatment relationship between Dr. Waterman and [Plaintiff]. Nonetheless, Dr. Waterman's treatment notes do not support a ten-pound lifting restriction. The opinion is somewhat consistent with the record and more consistent with the evidence in close temporal proximity to [Plaintiff]'s surgery. However, later evidence, including physical examination findings, show [Plaintiff] had full strength in her lower and upper extremities ([Tr. 952]).

(Id. (emphasis added).) Plaintiff challenges that assessment on two grounds, neither of which carries the day.

First, Plaintiff argues that "[t]he [ALJ's] supportability analysis is nothing more than a conclusion, which is insufficient." (Docket Entry 8 at 10 (citing Colgan v. Kijakazi, 22 F.4th 353, 364

11

(2d Cir 2022), and <u>LaMountain v. Saul</u>, No. 0:20CV3312, 2021 WL 5311239, at *4 (D.S.C. Sept. 9, 2021) (unpublished), <u>recommendation adopted sub nom.</u> <u>LaMountain v. Kijakazi</u>, 2021 WL 4932475 (D.S.C. Oct. 22, 2021) (unpublished)).)  In Plaintiff's view, "a proper supportability analysis would have to address Dr. Waterman's contemporaneous observation of failed treatment ([Tr.] 488) and positive exam findings ([Tr.] 491)[,]" because "[i]t is not obvious that Dr. Waterman's observations were not supportive of his opined limitations[.]"  (Docket Entry 8 at 10-11.)  Plaintiff further points out that, although "Dr. Waterman [] cite[d Plaintiff's] FCE (which . . . the ALJ rejected)" (<u>id.</u> at 11 (bracketed citation and footnote omitted) (citing Tr. 27)), "Dr. Waterman also cited Plaintiff's treatment measures in support of his opinion" (<u>id.</u> (citing Tr. 1111)).  Additionally, Plaintiff notes that the ALJ did not rely on Dr. Waterman's citation of the FCE as a basis to discount Dr. Waterman's opinions, and, thus, argues that such reliance "cannot be a basis for accepting the [ALJ]'s assessment of Dr. Waterman's [opinions]."  (<u>Id.</u> at 11 n.4 (quoting <u>Calcutt v. Federal Deposit Ins. Corp.</u>, 598 U.S. 623, 624 (2023), for proposition that "reviewing courts 'must judge the propriety of [agency] action solely by the grounds invoked by the agency'" (in turn quoting <u>Securities & Exch. Comm'n v. Chenery Corp.</u>, 332 U.S. 194, 196 (1974))).)

Here, the ALJ's prior discussion of Dr. Waterman's treatment of Plaintiff (see Tr. 23-27) permits the Court to meaningfully review the ALJ's statement that "Dr. Waterman's treatment notes d[id] not support a ten-pound lifting restriction" (Tr. 27), and that approach suffices, see Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018) (holding that courts "must read the ALJ's decision as a whole"); McCartney v. Apfel, 28 F. App'x 277, 279 (4th Cir. 2002) ("[T]he ALJ need only review medical evidence once in [the] decision."). In that regard, the ALJ observed that, at Plaintiff's first post-surgical follow-up with Dr. Waterman on February 24, 2022, although Plaintiff reported "5 out of 10" pain, Dr. Waterman noted that Plaintiff "[w]as tolerating the pain well" (Tr. 23 (emphasis added) (internal quotation marks omitted) (citing Tr. 663)), and "recommended [Plaintiff] continue physical therapy and use oral [non-steroidal anti-inflammatory drugs ('NSAIDs')] for pain" (id. (citing Tr. 664)). The ALJ further noted that Plaintiff returned to Dr. Waterman on October 12, 2023, after "a fall on October 3, 2023, and [reported] persistent pain since that time." (Tr. 25 (emphasis added) (citing Tr. 965).) The ALJ emphasized that, "although tenderness and mild effusion was noted[,] . . . there was normal bulk and tone, normal strength in firing of the quad[riceps] and hamstring, and full passive range of motion." (Id. (emphasis added) (citing Tr. 968).) Additionally, the ALJ remarked that "Dr. Waterman assessed . . . patellofemoral

13

arthritis, which was <u>not related to meniscal</u> or ligamentous <u>pathology</u>" (<u>id.</u> (emphasis added) (citing Tr. 969)), and that an "x-ray of the right knee showed <u>mild</u> tricompartmental degenerative changes but no acute fracture, malalignment, or joint effusion" (<u>id.</u> (emphasis added) (citing Tr. 989)).[7] The ALJ's discussion of those largely normal and mild findings supported his finding that "Dr. Waterman's treatment notes d[id] not support a ten-pound lifting restriction" (Tr. 27).[8]

Second, Plaintiff faults the ALJ's evaluation of the consistency of Dr. Waterman's opinions with other record evidence for "neglect[ing to cite] any positive findings from [consultative medical examiner Dr. Flores's] exam[,]" such as the fact that Plaintiff wore a knee brace, had a "slightly antalgic gait," and had "diminished knee motion" (Docket Entry 8 at 11 (citing Tr. 951-52)), and from other contemporaneous exam[ination]s[,]" such as "Dr. Waterman's October 12, 2023[,] exam[ination] showing mild effusion, medial knee joint tenderness, and positive patellofemoral grind maneuver" (<u>id.</u> (citing Tr. 968)). According to Plaintiff,

---

[7] Dr. Waterman assessed "<u>early</u> patellofemoral arthritis." (Tr. 969 (emphasis added).)

[8] Plaintiff correctly notes that the ALJ did not expressly cite Dr. Waterman's reliance on Plaintiff's FCE results as a reason to discount Dr. Waterman's opinions. (<u>See</u> Docket Entry 8 at 11 n.4 (citing Tr. 27).) However, common sense and logic dictate that, having found the FCE results to "ha[ve] little persuasive value given [that] the [FCE] results were deemed invalid" based on "[Plaintiff]'s poor effort" (Tr. 27 (citing Tr. 494, 513)), the ALJ would not find Dr. Waterman's reliance on that FCE a compelling basis for his opinions.

14

"it is impermissible for the [ALJ] to engage in selective citation to record evidence."  (Id. (citing Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 98-99 (4th Cir. 2020)).)[9]

The ALJ found Dr. Waterman's 10-pound lifting restriction inconsistent with "later evidence" post-dating Plaintiff's knee surgery, "including [Dr. Flores's] physical examination findings[] show[ing Plaintiff] had full strength in her lower and upper extremities."  (Tr. 27 (internal parenthetical citation omitted) (citing Tr. 952).)  Although the ALJ did not, in the same paragraph in which he evaluated the persuasiveness of Dr. Waterman's 10-pound lifting restriction, describe further evidence that lacked consistency with that restriction (see id.), earlier in the ALJ's decision, he discussed many aspects of the record evidence that did not harmonize with that restriction (see Tr. 23-27):

- "[an FCE] suggested [Plaintiff] was capable of at least sedentary to light work as of September 2022 (Tr. 24 (emphasis added) (referencing Tr. 494)), although the results were deemed invalid . . . based on [Plaintiff's] 'very poor effort'" (id. (emphasis added) (quoting Tr. 513)), and "[i]t was noted that [Plaintiff] seemed more limited by her aerobic capacity, with her heart rate spiking easily with exertion" (id. (emphasis added) (citing Tr. 506));

---

[9] Notably, the ALJ would not cite Dr. Waterman's findings as part of the ALJ's analysis of the consistency of Dr. Waterman's opinions, as consistency gauges the degree to which an opinion harmonizes with evidence from other medical sources in the record, see 20 C.F.R. § 404.1520c(c)(2), but, rather, as part of the ALJ's supportability analysis, which assesses how much a medical source supported his or her opinions with his or her own explanations and/or findings, see 20 C.F.R. § 404.1520c(c)(1).

15

- "[w]hile [Plaintiff] continued to have knee pain in 2023, she sought only <u>minimal, conservative treatment</u> (<u>id.</u> (emphasis added));

- "[a] June 2023 medical consultative examination [by Dr. Flores] showed [Plaintiff] had a <u>minimally antalgic gait</u>, <u>full strength</u> throughout, and could perform the postural and manipulative activities requested" (<u>id.</u> (emphasis added) (referencing Tr. 950-52)) and "reported being <u>able to perform activities of daily living</u>" (<u>id.</u> (emphasis added) (citing Tr. 949));

- at a follow up appointment with Plaintiff's primary care provider, Robin Brinkley Gibson, ANP ("NP Gibson") in August 2023, NP Gibson noted "tenderness of the right knee" but "<u>no swelling</u>" (<u>id.</u> (emphasis added) (citing Tr. 979));

- "[o]n October 4, 2023, [Plaintiff] returned to [NP] Gibson for a follow up visit regarding the right knee[,]" and "reported falling the day before and bruising her elbow" (<u>id.</u> (citing Tr. 1098)), and, <u>although NP Gibson "encouraged [Plaintiff] to use a cane when she [wa]s outside of her home for better stability, [Plaintiff] declined the recommendation"</u> (<u>id.</u> (emphasis added) (referencing Tr. 1102));

- "[o]n March 14, 2024, [Plaintiff] presented to the Atrium Health Weight Management Center for a follow up appointment[,]" and "reported her pain in the right knee had <u>decreased</u>, and she was <u>walking more</u> and having <u>improved toleration</u> with the exercise" (<u>id.</u> (emphasis added) (citing Tr. 1048)).

The ALJ's discussion of that evidence sufficiently explains his finding that "later evidence" post-dating Plaintiff's knee surgery lacked consistency with Dr. Waterman's 10-pound lifting restriction (Tr. 27).

Plaintiff's assertion that the ALJ cherry-picked the evidence supporting his decision to discount Dr. Waterman's opinion fares no

16

better.  Notably, the ALJ did discuss Dr. Flores's observations that Plaintiff "ambulated with a 'very slight antalgic gait'" (Tr. 24 (quoting Tr. 951)), and "w[ore] a right knee brace" (id. (citing Tr. 951)), as well as Dr. Waterman's findings on October 12, 2023, of "tenderness to palpation at the medial knee joint line and mild effusion" (id. (citing Tr. 968)).  Although the ALJ discussed neither Dr. Flores's finding of slightly reduced knee range of motion (see Tr. 24; see also Tr. 952), nor Dr. Waterman's finding of a positive patellofemoral grind maneuver (see Tr. 25; see also Tr. 968), "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision,'" Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)).  Moreover, Plaintiff has not explained how findings of a very slight antalgic gait, use of a knee brace (but not a cane), slightly reduced knee range of motion, tenderness at the joint line, positive patellofemoral grind test, and mild effusion should have compelled the ALJ to adopt Dr. Waterman's 10-pound lifting restriction (see Docket Entry 8 at 11), particularly given that Dr. Flores found full strength in Plaintiff's upper and lower extremities, normal sensation, negative Tinel's and Phalen's tests, negative straight leg raising tests, normal coordination, negative Romberg, no effusion, normal reflexes and normal ability to squat and tandem walk (see Tr. 951-52), and Dr. Waterman found Plaintiff

17

had normal bulk and tone, normal strength in her quadriceps and hamstring, full passive range of motion, and normal sensation (Tr. 968).

## 2. **Dr. Flores's Opinions**

Dr. Flores conducted a consultative medical examination of Plaintiff on June 24, 2023, at which Dr. Flores noted that Plaintiff could "walk to the examination room[] without any assistance . . . at a normal pace, did not use "any ambulatory assistive device," but did "wear[] a right knee brace," and could "manipulate small objects in both hands[] without difficulty." (Tr. 950.) In addition, Dr. Flores recorded "a very slight antalgic gait" (Tr. 951) and "slight limitation in the range of motion of the right knee" (Tr. 953; see also Tr. 952 (recording 0-110 degrees of right knee flexion)), but no edema, normal pulses, normal coordination, negative Romberg, negative straight leg raise tests, no spasm, no effusion, normal bulk and tone, normal sensation, normal reflexes, normal ability to squat and tandem walk, and negative Tinel and Phalen tests (see Tr. 951-52). As a result of those findings, Dr. Flores opined that Plaintiff could stand and walk "[u]p to six hours in an eight-hour workday" (Tr. 952), had "no limitations" on sitting (id.), could lift, carry, push, and pull "50 pounds occasionally, and 25 pounds frequently" (Tr. 953), could frequently climb steps and stairs (see id.), could occasionally climb ladders, scaffolds, and ropes (see id.), could

18

frequently balance, stoop, crouch, kneel, and crawl (see id.), and had no manipulative or environmental limitations (see id.).

The ALJ summarized Dr. Flores's findings and opinions (see Tr. 24, 27-28) and then evaluated the persuasiveness of Dr. Flores's opinions in the following manner:

> The [ALJ] finds this opinion to be partially persuasive. Dr. Flores had only a one-time examination of [Plaintiff] on which he based his opinion. His examination findings appear internally consistent. The opinion is not entirely consistent with the evidence, including imaging. In light of [Plaintiff]'s status post right knee arthroscopy, degenerative changes in the lumbar spine and cervical spine, and right knee degenerative joint disease - as well as imaging supporting these conditions - the [ALJ] finds light work is more appropriate and consistent with the record as a whole. Additionally, the [ALJ] finds [Plaintiff] is able to stand and/or walk for up to one hour before needing to sit sown for fifteen minutes while remaining on task.

(Tr. 28.)

Plaintiff contends that "the [ALJ] very generally alluded to supportability by stating that [Dr. Flores's opinions] w[ere] 'internally consistent' and noted inconsistency with unspecified imaging, the right knee surgery, and diagnoses to deviate from [Dr. Flores's] opinion[s,]" and "then generally alleged that 'the record as a whole' [sic] in deviating from [Dr. Flores's] opinion[s] both by exertional level and by adding very specific standing/walking limitations [to the RFC]." (Docket Entry 8 at 12 (quoting Tr. 28).) In Plaintiff's view, '[t]h[at] assessment[] d[id] not help . . . the Court[] in assessing how the [ALJ] came to the

19

specific RFC findings that [he] came to." (Id.; see also id. at 8 (citing Hudson v. Colvin, No. 7:12CV269, 2013 WL 6839672, at *9 (E.D.N.C. Dec. 23, 2013) (unpublished) ("The ALJ's modification of the RFC . . . does not remedy his failure to adequately address the medical evidence. Indeed, in the absence of an adequate discussion of the medical evidence, the ALJ's apparent compromise of [the] plaintiff's RFC to accommodate her allegations has an arbitrary tone.")).)

Contrary to Plaintiff's arguments, the ALJ's above-quoted analysis permits the Court to meaningfully review the path of the ALJ's reasoning. The ALJ explained that, although Dr. Flores's examination findings harmonized with his medium-exertion opinion, he conducted a one-time examination of Plaintiff, and Dr. Flores's findings "[we]re not entirely consistent with the evidence, including imaging[ of Plaintiff's cervical and lumbar spine and right knee]." (Tr. 28; see also Tr. 948 (documenting that Dr. Flores reviewed only "pain specialist notes dated November 22, 2022," "an x-ray of the right knee dated July 6, 2022," and "an operative noted dated September 20, 2022").)

Moreover, the ALJ's reduction of the standing and walking limitations in the RFC to four hours total and one hour at a time followed by 15 minutes of sitting (see Tr. 22) does not qualify as "'arbitrary'" (Docket Entry 8 at 8 (quoting Hudson, 2013 WL 6839672, at *9)). The ALJ here did not find any of the medical

20

opinions fully persuasive (see Tr. 27-28), and, thus, permissibly struck a balance between Dr. Flores's opinions limiting Plaintiff to lifting 50 pounds occasionally and 25 pounds frequently and standing/walking for up to six hours (see Tr. 952-53), the state agency medical consultants' opinions restricting Plaintiff to lifting 20 pounds occasionally and ten pounds frequently and standing/walking for six hours (see Tr. 94-95, 104), the (invalid) FCE results limiting Plaintiff to the sedentary-light exertional level (see Tr. 494) with frequent standing and walking (see Tr. 508), and Dr. Waterman's opinion limiting Plaintiff to the sedentary-light exertional level based on the (invalid) FCE, with a maximum of 10 pounds of lifting and no specified limits on standing or walking other than the limitation to sedentary-light exertion (see Tr. 1111). See Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008) ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); see also McNeill v. Berryhill, No. 1:16CV1081, 2017 WL 1184187, at *9-10 (M.D.N.C. Mar. 29, 2017) (unpublished) (rejecting the plaintiff's argument that, "because the ALJ rejected all opinion evidence present in the record, she impermissibly relied on her own lay assessment of evidence," where "ALJ struck a balance between the state agency physicians's medium-exertion RFC and the less-than-sedentary-exertion limitations opined by [the treating physicians]" (internal quotation marks and brackets omitted)),

21

<u>recommendation adopted</u>, slip op. (M.D.N.C. Apr. 24, 2017) (Eagles, J.).[10]

### 3.  **The State Agency Medical Consultants' Opinions**

The state agency medical consultant at the initial level of review opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk for up to six hours in an eight-hour workday, frequently climb ramps, stairs, ladders, ropes, and scaffolds, frequently balance and stoop, occasionally kneel, crouch, and crawl, and should avoid concentrated exposure to pulmonary irritants.  (<u>See</u> Tr. 94-95.) The reconsideration-level consultant largely agreed with the initial-level consultant's RFC assessment, but added a restriction to frequent pushing/pulling with the right lower extremity, reduced the climbing from frequent to occasional, and added avoidance of concentrated exposure to hazards.  (<u>See</u> Tr. 104-05.)

The ALJ found the consultants' opinions "not . . . overly persuasive" based on the following reasoning:

> [T]hese consultants did not have an opportunity to examine [Plaintiff] or see her in person, <u>nor did they have the benefit of viewing the entire medical record as it was available at the time of the hearing, or the</u>

---

[10] <u>Hudson</u> does not aid Plaintiff's cause.  In that case, the ALJ entirely failed to discuss the opinions and findings of <u>five</u> of Plaintiff's mental health providers, <u>see</u> <u>Hudson</u>, 2013 WL 6839672, at *6-7, and, thus, "omitt[ed] any mention of most of the medical evidence supportive of [the] plaintiff's allegations" and "engaged in impermissible cherry-picking[,]" <u>id.</u> at *8 (internal quotation marks omitted).  In contrast, here, the ALJ did not neglect to analyze any of the opinion evidence of record (<u>see</u> Tr. 27-28) and, as discussed above, did not engage in impermissible cherry-picking of the evidence.

22

> benefit of listening to [Plaintiff]'s testimony. The [ALJ] finds [the reconsideration-level consultant]'s findings to be more persuasive [than the initial-level consultant]'s as [the reconsideration-level consultant] provided greater postural and environmental restrictions to account for [Plaintiff]'s knee, back, and obesity limitations.

(Tr. 28 (emphasis added).) Plaintiff's conclusory argument that the above-quoted analysis lacks a "meaningful discussion of consistency" (Docket Entry 8 at 12) fails, because the ALJ addressed consistency when he noted that he did not accord greater persuasiveness to the consultants' opinions, because they did not fully harmonize with "the entire medical record as it was available at the time of the hearing" or with "[Plaintiff]'s testimony" (Tr. 28).

### 4.  Plaintiff's Subjective Statements Regarding Sitting Limitations and Leg Elevation

Plaintiff next contends that "[t]here is nothing in the record to justify the RFC's fifteen minutes of sitting between hours of standing . . . beyond arbitrary reasoning."  (Docket Entry 8 at 12.)  In that regard, Plaintiff points to her testimony that "she could stand for an hour at a time, but she estimated a need for two or three hours to recuperate, not fifteen minutes."  (Id. (citing Tr. 69).)  That argument, however, glosses over the fact that the ALJ acknowledged Plaintiff's statements on a Function Report "that it is difficult to walk, stand, or sit for long periods" (Tr. 23 (citing Tr. 276)), but the ALJ found "[Plaintiff]'s statements

23

concerning the intensity, persistence and limiting effects of [her] symptoms not entirely consistent with the medical evidence and other evidence in the record" (id. (emphasis added)). Thus, although the ALJ did not outright reject Plaintiff's subjective symptom reports, he did not fully credit them either. Indeed, the ALJ later reasoned:

> As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of . . . her symptoms, they are inconsistent because [Plaintiff] sought only conservative treatment for her . . . knee pain . . . . [T]he record shows [Plaintiff] had pain and swelling in the knee that is typical post-arthroscopy. As of October 2023, imaging of the right knee showed only mild degenerative changes. In addition, physical exam showed there was normal bulk and tone, normal strength in firing of the quad[riceps] and hamstring, and full passive range of motion of the right knee.

(Tr. 26 (internal parenthetical citations omitted).) That reasoning explains why the ALJ only partially credited Plaintiff's subjective symptom reports of needing two to three hours of rest after standing for one hour (see Tr. 69-70) by limiting her to one hour of standing at a time followed by 15 minutes of sitting (see Tr. 22).

Lastly, Plaintiff faults the ALJ for excluding Plaintiff's "need to elevate the right leg when sitting" from the RFC on the basis of 1) a lack of medical support for that limitation, and 2) the absence of treatment for right knee pain after October 2023. (Docket Entry 8 at 13 (citing Tr. 26-27).) According to Plaintiff, although "the record show[s] that the last documented

24

recommendation of leg elevation over the heart occurred in a physical therapy appointment on February 4, 2022[,] . . . the record does not actually show that this advice either ceased at any point or ceased to be followed at any point." (Id. (citing Tr. 680).) Plaintiff additionally notes that the ALJ's reliance on the lack of knee treatment after October 2023 "makes an assumption about treatment level with insufficient discussion[,]" because "[s]ymptom plateauing, lack of effective treatments, and cost are all reasons that the [SSA] has recognized as needing to be considered when citing treatment level in a decision." (Id. (citing Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *9-10 (Oct. 25, 2017) ("SSR 16-3p")).) Plaintiff further objects to the ALJ's "not[ing] that Plaintiff was seeking treatment for weight loss but [] not acknowledg[ing] that it was affected by her knee issues and is intuitively related to allowing easier knee function and further treatment options." (Id. (internal parenthetical citations omitted) (citing Tr. 27, 495).)

The ALJ indeed rejected Plaintiff's testimony that she needed to elevate her right knee above the level of her heart when sitting, in part, because "the medical evidence d[id] not appear to order such an order at this point following her surgery." (Tr. 26-27.) On February 4, 2022, less than a month after Plaintiff's arthroscopic surgery on her right knee on January 10, 2022 (see Tr.

25

693-707), Plaintiff "complain[ed] of swelling in her [right] knee[,]" and her physical therapist "[e]ncouraged [Plaintiff] to elevate her right [lower extremity] above the level of her heart to decrease her swelling" (Tr. 680). Although Plaintiff concedes no further recommendations to elevate her right leg exist in the record, she nonetheless argues that the "record does not actually show that this advice either ceased at any point or ceased to be followed at any point." (Docket Entry 8 at 13.) That argument ignores the fact that Plaintiff's knee surgeon, Dr. Waterman, did not include a requirement that Plaintiff elevate her right extremity at all, let alone above heart level, in his comprehensive restrictions he issued in connection with Plaintiff's Workers' Compensation claim on October 11, 2022 (see Tr. 1111).

The ALJ additionally rejected Plaintiff's alleged need to elevate her right knee above her heart because "the record d[id] not show that [Plaintiff] sought treatment for her knee after October 2023[,]" as "[m]ost other appointments were focused on losing weight and potential plastic surgery post weight loss." (Tr. 27.) Although Plaintiff maintains that the ALJ should have considered whether "[s]ymptom plateauing, lack of effective treatments, and cost" justified the absence of knee treatment after October 2023 (Docket Entry 8 at 13 (citing SSR 16-3p, 2017 WL 5180304, at *9-10)), Plaintiff did not allege that any of those factors played a role in the dearth of knee treatment after October

26

2023 (see Tr. 43-71; see also Tr. 64 (acknowledging that Dr. Waterman encouraged Plaintiff to continue getting knee injections to treat her chronic knee pain)). Furthermore, the record strongly suggests that those factors did not play a role because, after October 2023, Plaintiff continued to receive comprehensive treatment at the Atrium Health Weight Management Center (see Tr. 1032-36, 1048-51), attend follow-up visits with NP Gibson (see Tr. 1055-58), as well as consult with a plastic surgeon about breast reduction surgery (see Tr. 1040-44), and the record shows that Plaintiff's treatment providers offered additional treatments and options for her knee pain, such as "adductor canal PNS" (Tr. 475, 480, 540) and a cane (see Tr. 974), which Plaintiff declined (see Tr. 475, 480, 974). In fact, Dr. Waterman encouraged Plaintiff on October 11, 2022, to follow-up with pain management to pursue "possible corticosteroid injections, and other nonsurgical treatment measures for optimization of current symptoms." (Tr. 1111.) Moreover, Plaintiff's assertion that the ALJ ignored the fact that weight loss might help lessen Plaintiff's knee pain (see Docket Entry 8 at 13) misses the mark. The fact that losing weight might have helped reduce Plaintiff's knee pain does not detract from Plaintiff's lack of treatment for allegedly disabling knee pain and the absence of justifications in the record for such a lack of treatment.

27

In light of the foregoing analysis, Plaintiff's sole assignment of error falls short.

### III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 27, 2026

28